IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



CARLOS BLADIMIR MONTOYA,       )
                                )
                Petitioner,     )
                                )
V.                              )       Criminal No. 1:09CR247
                                )       Civil Action No. 1:12CV1110
UNITED STATES OF AMERICA,       )
                                )
                Respondent.     )
_____)

## MEMORANDUM OPINION

This case comes before the Court on Carlos Bladimir
Montoya's ("Petitioner") Petition To Vacate, Set Aside and/Or
Correct His Sentence Pursuant to Title 28, U.S.C. Section 2255.

On May 28, 2009, a federal grand jury in the Eastern
District of Virginia returned an Indictment charging the
Petitioner with conspiracy to commit murder in aid of
racketeering activity, in violation of 18 U.S.C. § 1959(a)(5);
murder in aid of racketeering activity, in violation of 18 U.S.C.
§§ 1959(a)(1) and 2; and use of firearms during a crime of
violence causing death, in violation of 18 U.S.C. §§
924(c)(1)(A) and (j), and 2. At his Arraignment on June 5, 2009,
the Petitioner pleaded not guilty and demanded a trial by jury.

1

The trial commenced on January 19, 2010, and the government presented two days of trial testimony. The Petitioner called one witness in its case, and then rested. On January 21, 2010, the jury returned a verdict finding the Petitioner guilty on all three counts of the Indictment. On May 21, 2010, the Court sentenced the Petitioner to concurrent sentences of life and 120 months of imprisonment on the racketeering offenses, and a consecutive sentence of 120 months of imprisonment on the firearms offense. The Petitioner appealed his conviction and sentence, and the United States Court of Appeals for the Fourth Circuit affirmed his conviction and sentence on May 9, 2011. The Supreme Court denied the Petitioner's Petition For A Writ Of Certiorari on October 3, 2011.

At trial, the Government presented evidence that the gang Mara Salvatrucha, or MS-13, was a criminal enterprise involved in racketeering activity. MS-13 was formed in Los Angeles in the 1980s by El Salvadoran immigrants. Since its inception in California, MS-13 has spread across the United States, and into Central America, South America, Canada, Italy, and Spain. MS-13 first began operating in the Northern Virginia area in 1993.

A person becomes a member of MS-13 through a violent initiation process referred to as being "jumped in," whereby the new recruit is beaten by a group of MS-13 members for

approximately 13 seconds. MS-13 members identify themselves to others by using specific handshakes or hand signs, including one referred to as "La Garra," which means the claw. MS-13's colors are blue and white. Some members may also have MS-13 tattoos.

MS-13 members are "jumped in" to cliques. Cliques are smaller groups, usually associated with a particular geographic area. Cliques usually meet every week or two. Cliques have a leader, who is called "Primera," meaning first, or "Primera Voz," meaning first voice. Cliques also have a second leader called "Segundo," meaning second, or "Segundo Voz," meaning second voice. Clique leaders in a given geographic area will meet periodically, usually once a month, in a "general meeting."

MS-13 members pay dues at clique meetings. The dues are used to assist members who are imprisoned and/or in El Salvador, or to buy weapons for the gang. MS-13 members often use Western Union to transmit money to members outside the United States.

MS-13's purpose is to instill fear and intimidation in communities. This purpose is accomplished through adherence to a set of rules governing MS-13 membership. Gang members must be loyal to the gang. They must protect fellow gang members during a fight, and never cooperate with law enforcement. MS-13 members are also expected to "patrol" for rival gang members, referred to as "chavalas." When a rival gang member is encountered, MS-13

members must attack, beat, and, if possible, kill the rival gang member.  MS-13 members who participate in killing chavalas gain the respect of other MS-13 members.

An MS-13 member who violates one of the gang's rules will be punished by the gang.  Depending on the rule that has been violated, punishment can range from a "calenton" , i.e., 13-second beating , to a "green light", i.e., death sentence.  The only punishment for breaking the rule against cooperating with the police is a "green light," or death sentence.

At trial, in addition to proving that MS-13 was a criminal enterprise, the Government presented evidence establishing beyond a reasonable doubt that MS-13 was engaged in racketeering activity. Specifically, it introduced evidence proving that other MS-13 members murdered a juvenile male, J.S., on or about May 16, 2004; murdered Shannah Angeles in and around July 2006; and distributed cocaine in Northern Virginia from early 2007 to March 2008.  The Government did not allege and did not introduce at trial any evidence to suggest that the Petitioner participated in these two murders.  Rather, the Government offered that evidence to prove that the enterprise, MS-13, was engaged in racketeering activity.

The Government also proved at trial that the Petitioner conspired with other MS-13 members to murder Melvin Reyes, a

4

member of a rival gang. The evidence established beyond a
reasonable doubt that the Petitioner drove his fellow gang
members to find Reyes, waited in the car while they shot Reyes
several times at close range, drove them away from the scene, and
celebrated with them upon learning that Reyes had died from his
wounds. Specifically, the government's evidence established the
following facts: 1) In May 2007, the Petitioner was a member of
the ULS clique of MS-13, having joined that clique five years
earlier; 2) the Petitioner was known by other MS-13 gang members
as "Ciego"; 3) during his membership with MS-13, the Petitioner
held a leadership role in his clique and attended general
meetings; and 4) the Petitioner also associated with MS-13
members who belonged to other cliques.

In the months preceding May 5, 2007, MS-13 gang members
Oscar Lobo Lopez, also known as "Joker," and Sergio Amador, also
known as "Dado," had several confrontations with Melvin Reyes,
also known as "Pelon," a member of the rival 18th Street gang.
Reyes was observed on several occasions in an area of
Springfield, Virginia, where MS-13 operated. Reyes proudly
displayed his allegiance to the rival 18th Street gang through
his tattoos.

Beginning in or about early 2007, Lopez and Amador began
"patrolling" for Reyes on a daily basis and planned to hurt or

kill him if they found him. At times, they were assisted by other
MS-13 members.  While patrolling in the Springfield area, Lopez
would ask people who knew Reyes whether they had seen him.   At
one point in time, Lopez and Amador learned that Reyes had left
Virginia, but in early May 2007, they learned that Reyes had
returned to the Springfield, Virginia area.

In the early morning hours of May 5, 2007, the Petitioner
was socializing with Amador, Lopez, and two MS-13 members from
New York known as "Snarf" and "Flecha" at the home of an
acquaintance named Gloria, who was also known as "China."  While
there, the five MS-13 gang members discussed their plan to murder
Reyes.  In the middle of the night, at around 2 or 3 a.m. on May
5, 2007, the Petitiner, Lopez, Snarf, and Flecha went patrolling
for Reyes with the Petitioner driving the group around in his
car to facilitate the search.

Around 9 or 10 a.m. later that morning, Lopez reported to
Amador that the group had not located Reyes the night before.
That afternoon, Amador, Lopez, and Snarf , using the Petitioner's
vehicle, went looking for Reyes on Commerce Street in
Springfield, Virginia. There, Amador and Lopez asked two
acquaintances about Reyes' whereabouts, and were told that Reyes
would be returning to Commerce Street later that night. While the
others were searching for Reyes that afternoon, the Petitioner and

6

Flecha remained at the Petitioner's house in Sterling, Virginia, where Flecha and Snarf had been staying.

Lopez, Amador, and Snarf then drove to Sterling, Virginia to pick up the Petitioner and Flecha as well as Snarf's Charter Arms .38 revolver. At the Petitioner's residence, Flecha handed Snarf his gun in the presence of the Petitioner and Amador. The Petitioner then drove the entire group to Lopez's house to pick up Lopez's .380 caliber semiautomatic pistol. At Lopez's house, the group discussed who would be shooting Reyes once he was located, and it was initially decided that the two shooters would be Lopez and Snarf. AfterLopez retrieved his semiautomatic pistol, the Petitioner drove Lopez, Amador, Snarf, and Flecha back to Commerce Street to look for Reyes.

The Petitioner, Lopez, Amador, Snarf, and Flecha were unsuccessful in locating Reyes on their first attempt that evening. After smoking marijuana outside Gloria's house for approximately fifteen minutes, the Petitioner drove the entire group back to Commerce Street to search for Reyes. The Petitioner first parked his two-door car behind the Commerce Street apartments, but after the car's occupants were seen by individuals who knew them, the Petitioner moved his car and parked farther away from the apartments. All five men waited for Reyes to surface. Inside the car, with the Petitioner still

7

sitting in the driver's seat, it was discussed and decided that Amador should have Snarf's revolver so that Amador and Lopez could be the ones to kill Reyes. Amador, who was sitting in the back seat with Snarf and Flecha, asked Snarf for his .38 revolver, and Snarf handed him his gun. Lopez, carrying his .380 semiautomatic pistol, sat next to the Petitioner in the front seat of the car.

After waiting for some time, the Petitioner and the other four MS-13 members observed Reyes exit one of the apartment buildings and cross the street. When some people had dispersed and Reyes was surrounded by only a couple of potential witnesses, Amador and Lopez ran out of the car with guns in hand. The Petitoner remained in his car, with the lights turned off but with the engine still running.

Lopez and Amador pursued Reyes while firing shots at him. Reyes fell onto the parking lot of the apartment building. As Amador and Lopez approached the fallen Reyes, Lopez told Amador to "finish" Reyes off. Amador then fired a final series of gunshots at Reyes at close range. Snarf went to check that Reyes was dead, while Flecha looked around to see if anyone was approaching the scene. Amador, Lopez, Snarf, and Flecha then ran back to the car, and the Petitioner immediately drove the group away from the scene. Reyes, who was shot seven times, died at

8

the scene from gunshot wounds to his head and his abdomen.

After leaving the scene without detection, the Petitioner, Lopez, Amador, Snarf, and Flecha went to Lopez's residence. Later that night and the next day, they celebrated Reyes' death. Two days after the murder, Flecha and Snarf returned to New York.

On October 8, 2007, police officers in Suffolk County, New York seized the Bersa .380 semi-automatic handgun used in the Reyes murder from the glove compartment of a vehicle during a traffic stop. The car's occupants were a known MS-13 gang member and other individuals with MS-13 tattoos. On March 19, 2008, Suffolk County detectives recovered the Charter Arms .38 revolver used in the Reyes murder from an individual with MS-13 tattoos. On March 23, 2009, after Amador and Lopez had already been arrested and charged in connection with Reyes' murder, the Petitioner was interviewed at a Kohl's parking lot by Detective Christopher Flanagan and Special Agent Martha Beltran. During the noncustodial interview, the Petitioner admitted to driving fellow MS-13 members to patrol for Reyes, to seeing these members with firearms, and to waiting in the car while they shot and killed Reyes. Reyes, however, refused to implicate Amador and Lopez in the murder. Two days after the interview at the Kohl's parking lot, the Petitioner agreed to be interviewed at the United States Attorney's Office in Alexandria, Virginia. During

this second interview, the Petitioner provided additional
information about the murder and, for the first time, identified
two of the participants in the murder by their nicknames. The
Petitioner was asked again about Amador and Lopez, but Petitioner
did not identify them as participants in the shooting.

A prisoner in custody under sentence of a federal court may
file a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside
or correct the sentence. The Supreme Court has interpreted the
statute as stating four grounds on which relief can be claimed:
1) that the sentence was imposed in violation of the
Constitution or laws of the United States; 2) that the court was
without jurisdiction to impose such sentence; 3) that the
sentence was in excess of the maximum authorized by law; and 4)
that the sentence is otherwise subject to collateral attack.
Hill v. United States, 368 U.S. 424, 426-27 (1962) (quoting 28
U.S.C. § 2255). A sentence is "otherwise subject to collateral
attack" only when there exists an error constituting a
"fundamental defect which inherently results in a complete
miscarriage of justice." United States v. Addonizio, 442 U.S.
178, 185 (1979). The Supreme Court has expressed its preference
that most cases for ineffective assistance of counsel claims be
raised in a § 2255 motion. Massaro v. United States, 538 U.S.
500, 504 (2003).

The test for ineffective assistance of counsel is two-pronged. Petitioner must show that 1) his counsel's performance was deficient, and 2) the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To prove that counsel's performance was deficient, a petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of the prevailing professional norms. Bell v. Evatt, 72 F.3d 421, 427 (4th Cir. 1995) (citing Strickland, 466 U.S. at 688). A petitioner must overcome the presumption that his counsel's conduct might be considered sound trial strategy. Strickland, 466 U.S. at 689 (citing Michel v. Louisiana, 350 U.S.91, 101 (1955)). To prove prejudice, a petitioner must show that counsel's errors were so serious as to deprive him of a fair trial, not merely that the outcome of the trial would have been different. Lockhart v. Fretwell, 506 U.S. 364, 369 (1993) (citing Strickland, 466 U.S. at 687). If petitioner fails to prove prejudice, a reviewing court need not consider the performance prong. Fields v. Attorney General of Maryland, 956 F.2d 1290, 1297 (4th Cir. 1992) (citing Strickland, 466 U.S. at 697).

The Petitioner first argues that his trial counsel were ineffective because they did not move to suppress the statements that he made to Fairfax County Detective Christopher Flanagan and

11

FBI Special Agent Martha Beltran during an interview at a Kohl's parking lot on March 23, 2009. MONTOYA claims that the interview constituted a custodial interrogation requiring Miranda warnings, and that his trial counsel provided deficient representation in failing to seek suppression of his incriminating statements on those grounds.

The Petitioner neither disputes the trial testimony of Detective Flanagan and Special Agent Beltran nor proffers additional facts that would call such testimony into question. Accordingly, the facts on this issue are not in dispute. Based on these undisputed facts, there is no question that the March 23, 2009 interview of Petitioner was non-custodial. As a result, the Petitioner's constitutional rights were not violated and his trial counsel provided effective assistance of counsel in determining that there was no good faith basis for challenging the admission of the Petitioner's incriminating statements at trial.

On March 23, 2009, the Petitioner agreed to meet with Detective Christopher Flanagan and Special Agent Martha Beltran. Before the meeting, the Petitioner and the officers had mutually chosen the location, specifically, the parking lot of the Kohl's department store in Sterling, Virginia. Detective Flanagan and Special Agent Beltran arrived at the parking lot in Detective

Flanagan's vehicle. The Petitioner arrived in his own vehicle,
which he was driving. At around 4:45 p.m., the Petitioner
entered Detective Flanagan's vehicle and sat in the front
passenger seat. Detective Flanagan was in the driver's seat and
Special Agent Beltran was in the back seat.

     As soon as the Petitioner entered his vehicle, Detective
Flanagan told Petitioner that he appreciated him taking the time
to talk to him and Special Agent Beltran. Detective Flanagan
also told the Petitioner that he was not under arrest, that he
would be going home, and that he and Special Agent Beltran wanted
to talk to him about the activities of MS-13. The Petitioner
then agreed to speak with both law enforcement officers.
During the interview, the Petitioner advised that he had joined
the MS-13 gang in approximately 2002, and had been jumped into
the ULS clique. The Petitioner advised that he became a leader of
his clique, and attended clique meetings as well as general
meetings. The Petitioner also spoke about several of the MS-13
rules, including the one that required gang members to attack
chavalas with whatever weapons they had at their disposal. When
asked about whether he had heard anything about the 18th Street
gang member killed in Springfield, Virginia, the Petitioner first
said he had only heard about it on the news. When he was shown
photographs of MS-13 members who had been involved in the murder

of Reyes, the Petitioner said he knew one of them but could not remember his nickname and claimed that he did not know or remember the other two.

Detective Flanagan then told the Petitioner that he had been investigating the Commerce Street murder and that he did not think Petitioner was being completely truthful. At that point, the Petitioner sighed, put his head down, and proceeded to provide details about his involvement in Reyes' murder. The Petitioner admitted that on the day of the murder, he drove three other MS-13 gang members around nearby apartments to patrol for a particular "chavala," the term the gang used to refer to a rival gang member. The Petitioner reported that later that same day, after he and the same three gang members learned that the chavala had returned to the area they had been patrolling, he drove the three gang members back to the same apartment complex in search of the chavala. The Petitioner told Detective Flanagan and Special Agent Beltran that as he drove the group for the second time, he saw two guns in the car, one of which was a revolver. The Petitioner further reported during the interview that he had parked his car on the road in the back of the apartment complex and left the car running as the other three individuals exited his car and headed towards the back of the apartment complex. The Petitioner stated that within a minute or so, he heard

14

gunshots and shortly thereafter the same three individuals came running back to the car. Petitioner admitted that he drove the three subjects away from the scene and that they were all celebrating and bragging about the fact that they had shot and possibly killed a chavala. The Petitioner told the officers that he and the three gang members later learned that the chavala had died.

During his recounting of the circumstances surrounding Reyes' murder, the Petitioner did not identify by name, or even nickname, the three other gang members who were involved in the murder. Instead, he described one as a gang member from El Salvador, another as a gang member from New York, and the other as a recently-initiated gang member. According to the Petitioner, the MS-13 gang member from El Salvador had possession of the revolver, and the newly-initiated gang member was in possession of another gun. Only when specifically asked about a gang member named Flecha, did Petitioner volunteer that Flecha was the name of the gang member from New York involved in the murder. Even though the Petitioner was specifically asked about Lopez and Amador and shown photographs of both men, he did not implicate Lopez or Amador in the murder.

The interview conducted at the Kohl's parking lot lasted no more than an hour and a half. Consistent with the assurances

15

Detective Flanagan made to him at the beginning of the
interview, the Petitioner was not arrested. Before Petitioner
left, Detective Flanagan, cognizant of the fact that gang members
are at risk if they cooperate or talk to law enforcement, told
the Petitioner to contact him immediately if he felt threatened
in any way or if his family members were threatened in any way.
Detective Flanagan also told the Petitioner that the next time
they met, it would probably be with an Assistant United States
Attorney. The Petitioner and the officers then departed the
Kohl's parking lot in separate vehicles.

Two days later, the Petitioner agreed to be interviewed at
the United States Attorney's Office in Alexandria, Virginia. The
Petitioner arrived to the office building in his own vehicle,
unaccompanied by law enforcement. During this second interview,
which was attended by Detective Flanagan, Special Agent Beltran,
and two prosecutors, the Petitioner provided additional
information about Reyes' murder. In contrast to the interview
two days earlier, in this interview the Petitioner identified
Snarf as having been a participant in the murder, and referred to
Snarf and Flecha by their nicknames rather than as "the MS guy
from El Salvador" and "the MS guy from New York." At this
interview, Petitioner claimed that Snarf had been in possession
of the .38 revolver before the murder. The Petitioner was asked

again about Amador and Lopez, and he again refused to identify

them as participants in the shooting. At the end of the

interview, Petitioner left the United States Attorney's Office.

The Fifth Amendment provides in pertinent part that "[n]o person

. . . shall be compelled in any criminal case to be a witness

against himself." U.S. Const. Amend. V. In Miranda v. Arizona,

the Supreme Court held that custodial interrogations have the

potential to undermine the Fifth Amendment privilege against

self-incrimination by possibly exposing a suspect to physical or

psychological coercion. 384 U.S. 436, 448-50, 455 (1966). To

guard against such coercion, the Supreme Court established a

prophylactic procedural mechanism requiring officers to advise a

suspect in custody of the following rights and warnings before

questioning him: 1) the right to remain silent; 2) any

statements can be used against him at trial; 3) the right to the

presence of a lawyer during questioning; and 4) if he cannot

afford an attorney, one will be appointed. 384 U.S. at 444.

Miranda and its progeny have repeatedly held that such

warnings are required only when a suspect is interrogated while

in custody. See, e.g., Stansbury v. California, 511 U.S. 318,

322 (1994) (per curiam); Illinois v. Perkins, 496 U.S.

292, 297 (1990); Berkemer v. McCarty, 468 U.S. 420, 434 (1984);

California v. Beheler, 463 U.S. 1122, 1125 (1983); Beckwith v.

17

<u>United States</u>, 425 U.S. 341, 346 (1976). An individual is considered to have been "in custody" for <u>Miranda</u> purposes if there was "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>Stansbury</u>, 511 U.S. at 322 (quoting <u>Beheler</u>, 463 U.S. at 1125). Courts must consider the totality of circumstances to determine whether a reasonable person in the suspect's position would have felt that he "was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).

In determining whether a defendant was in custody for purposes of <u>Miranda</u>, the courts have considered various factors. The location of the interview, while not dispositive, is a common factor. If the environment is familiar or public, the interview is less likely to be deemed custodial in nature. <u>See</u>, <u>e.g.</u>, <u>Beckwith</u>, 425 U.S. at 345-47 (<u>Miranda</u> warnings not required because agents conducted cordial interview of suspect at his home); <u>United States v. Courtney</u>, 463 F.3d 333, 337 (5th Cir. 2006) (suspect who voluntarily met with law enforcement agents in both a public place and place of employment and was not told she could not leave was not in custody); <u>United States v. Photogrammetric Data Services, Inc.</u>, 259 F.3d 229, 241 (4th Cir. 2001) (suspect who was interviewed in his own home for an hour and a half and whose movements were not restricted was not in

18

custody for purposes of Miranda).

However, the fact that an interview takes place at a police
station or inside a police car does not necessarily render it a
custodial interview. Indeed, interviews conducted at police
stations have been held to be non-custodial when the defendants
have volunteered to meet or accompany officers there. See, e.g.,
Beheler, 463 U.S. at 1125 (defendant not in custody because he
voluntarily accompanied police to station, was interviewed for
30 minutes, and was permitted to leave); Oregon v. Mathiason,
429 U.S. 492, 495 (1977) (Miranda warnings not required when
suspect voluntarily accompanied police to station to answer
questions and was immediately informed he was not under arrest);
United States v. Budd, 549 F.3d 1140, 1145-46 (7th Cir. 2008)
(defendant not in custody because he voluntarily went to police
station and was told that he was not under arrest and could
leave at any time); United States v. Uzenski, 434 F.3d 690, 704-
705 (4th Cir. 2006) (suspect not in custody because he
voluntarily went to police station, was not restrained, was told
that he was not under arrest, and agents did not threaten the
defendant or brandish their weapons); McCown v. Callahan, 726
F.2d 1, 6 (1st Cir. 1984) (Miranda warnings were not required
when defendant voluntarily accompanied officers to sheriff's
office, was told he was not under arrest, and left the station

19

undisturbed).

Another factor courts consider in conducting the "custody" analysis is whether the defendant was told that he was not under arrest or that he was free to leave. See, e.g., United States v. Lawson, 563 F.3d 750, 753 (8th Cir. 2009) (interview was not custodial because agent advised defendant that he was not going to be arrested, defendant was not restrained, interview lasted less than one hour, and defendant was not arrested at conclusion of interview); Budd, 549 F.3d 1145-46 (defendant not in custody because, after voluntarily going to police station to be interviewed, was told that he was not under arrest and could leave at any time); United States v. Willaman, 437 F.3d 354, 360 (3d Cir. 2006) (defendant was not in custody because he was informed that he was free to leave, was not restrained or intimidated, and officers did not display their weapons or interview him at length); Uzenski, 434 F.3d at 704-705 (fact that defendant was told that he was not under arrest during interview at police station was one of the factors establishing that he was not in custody); United States v. Badmus, 325 F.3d 133,138-39 (2d Cir. 2003) (although defendant and his wife were directed to stay seated in their living room, Miranda warnings were not required because agents repeatedly told them they were not under arrest).

The length of the interview and the use of coercive tactics

such as force, threats, or intimidation by officers are other

factors frequently considered in determining whether a defendant

was in custody. See United States v. Panak, 552 F.3d 462, 467,

471 (6th Cir. 2009) (even though she was not told that she was

free to leave, defendant was not in custody because interview

conducted in her own home and lasted 45 minutes to an hour, and

defendant was not handcuffed or restrained and voices were not

raised); Uzenski, 434 F.3d at 704-705 (suspect not in custody

because, among other circumstances, the agents did not draw their

weapons or otherwise threaten him); United States v. Rogers, 391

F.3d 1165, 1170 (10th Cir. 2004) (Miranda warnings not required

when police questioned suspect in his home and were cordial and

not intimidating).

Based on the totality of circumstances in this case, it is

clear that the Petitioner was never subjected to a custodial

interrogation.  The Petitioner voluntarily met Detective

Flanagan and Special Agent Beltran at a mutually convenient

location in the late afternoon.  The interview was conducted in a

parked car in a public place. At the very outset of the

interview, Detective Flanagan made it clear to Petitioner that he

was not under arrest and would not be arrested that day.  The

Petitioner was never told that he could not leave. The interview

was cordial and lasted no more than 90 minutes. The officers did not display their weapons or make any attempt to restrain the Petitioner's movements. In light of all these circumstances, a reasonable person in Petitioner's position would have felt free to terminate the interview and leave. As a result, the Petitioner was not entitled to Miranda warnings.

In arguing that his trial lawyers were ineffective in failing to file a motion to suppress his inculpatory statements, the Petitioner argues that the Fourth Circuit's decision in Tice v. Johnson, 647 F.3d 87 (4th Cir. 2011) "is analogous to the present circumstances." The Petitioner's reliance on Tice is misplaced because there is nothing in that decision that supports the Petitioner's Petition. In Tice, the Fourth Circuit held that defense counsel was ineffective in failing to file a motion to suppress statements the defendant made to law enforcement after he invoked his right to remain silent. 647 F.3d at 106. Neither compliance with Miranda nor the custodial nature of the interrogation were issues in Tice. In that case, the defendant was read his Miranda rights, initially waived them, and subsequently indicated that he did not wish to make any further statements. Id. at 96-97. Therefore, Tice speaks only to defense counsel's failure to move to suppress statements made by a defendant who received Miranda warnings and invoked his

rights. As those issues are not present here, the Fourth
Circuit's decision in Tice is inapposite to the Petitioner's
claims of ineffective assistance of counsel.

The Petitioner fares no better in relying on the Fourth
Circuit's decision in United States v. Colonna, 511 F.3d 431, 435
(4th Cir. 2007). In that case, the Fourth Circuit held that the
defendant's motion to suppress should have been granted because
officers failed to provide the defendant with Miranda warnings
before subjecting him to a custodial interrogation. However,
the circumstances that led the court to conclude that the
defendant was in custody are materially different from those
present in the instant case. In Colonna, the defendant was
asleep when twenty-four law enforcement agents arrived to execute
a search warrant at his family's home. The agents kicked open
the defendant's bedroom door and, at gunpoint, ordered the
defendant to dress and come downstairs. Although the agents
told him that he was not under arrest, they never left him
unattended and instead followed him, his mother, and his sister
when they went outside. The defendant was questioned for
approximately three hours with cigarette breaks, but was
constantly guarded during the breaks. Thus, the Fourth Circuit
concluded that considering the totality of circumstances, a
reasonable man in Colonna's position would have felt that his

23

freedom was curtailed to a degree associated with formal arrest.

None of the coercive pressures that made a reasonable man in Colonna's position believe he was not free to leave were present in the Petitioner's case. In stark contrast to the interrogation in Colonna, the interview of the Petitioner was arranged in advance and conducted at a mutually convenient time and place. Unlike the twenty-four agents in Colonna, Detective Flanagan and Agent Beltran never displayed their weapons and never restricted Petitioner's movements. Accordingly, Colonna does not advance the Petitioner's argument.

The Petitioner does not claim that the subsequent interview at the United States Attorney's Office was custodial in nature. Instead, he argues that his subsequent statements were "fruit of the poisonous tree." Because the Petitioner was not in custody during the March 23, 2009 interview at the Kohl's parking lot, there was no violation of Miranda and, thus, no poisonous tree.

In electing not to file a motion to suppress his statements based on a purported Miranda violation, trial counsel did not provide deficient representation. Such a motion would have been baseless as Petitioner's interviews with law enforcement on March 23 and 25, 2009 were consensual and noncustodial. Because a motion to suppress would certainly have been rejected given the undisputed facts in this case, the Petitioner suffered no

prejudice from his counsel's decision to forgo filing such a
motion.

The Petitioner claims that his trial counsel provided
ineffective assistance by not challenging extremely prejudicial
and irrelevant evidence, namely testimony from a gang expert
about MS-13. Petitioner contends that Detective Claudio Saa, the
gang expert, improperly testified to the ultimate issue of
whether MS-13 members committed murders to increase their status
in the gang. Contrary to Petitioner's assertions, the gang
expert's testimony was relevant evidence admitted to prove the
racketeering elements of this offense. The gang expert's
testimony, moreover, was not prejudicial because it did not
attempt to introduce hearsay statements in violation of the Sixth
Amendment's Confrontation Clause.

Trial counsel made an informed and strategic decision to
challenge the weight, not admissibility, of the testimony by
Detective Saa, the government's gang expert. Based on his
experience and training, Detective Saa, had been qualified as an
expert in various state and federal courts in Maryland and
Virginia. Moreover, Detective Saa had been qualified in this
Court on four prior occasions.

Detective Saa was qualified based on his experience and
training to testify as an expert. He had been a police officer

for ten years, and a member of the Northern Virginia Regional Gang Task Force for six years. He had investigated various gangs, including MS-13, 18th Street, the Bloods, and the Crips. Approximately 85 percent of his gang investigations involved MS-13. During the course of his investigations into MS-13, Detective Saa interviewed more than 50 MS-13 members. Detective Saa also attended anti-gang training and conferences in Virginia, throughout the United States, and in Central America, specifically El Salvador. Detective Saa also provided training to law enforcement agencies and civic groups on gang prevention awareness addressing MS-13 and 18th Street.

On cross-examination, trial counsel questioned Detective Saa's educational background. Trial counsel also highlighted the fact that Detective Saa had not published any articles or books on gangs. Trial counsel also questioned Detective Saa's knowledge of the gang's rules and which rules were paramount.

Nothing in the record suggests that trial counsel's performance was deficient in not objecting to the expert's testimony. Expert testimony is permissible if it assists the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. An expert witness may be qualified by knowledge, skill, experience, training, or education. The text of Rule 702 contemplates that an expert

may be qualified on the basis of experience alone.

Expert witnesses, including law enforcement gang experts, can base their expert opinion testimony on types of information, including hearsay, that are not themselves admissible. See Fed. R. Evid. 703; United States v. Mejia, 545 F.3d 179, 197 (2d Cir. 2008). Mejia reaffirms that law enforcement experts' reliance on hearsay is "consistent with the ordinary practice of law enforcement officers, who 'routinely and reasonably rely upon hearsay in reaching their conclusions.'" Id. (quoting United States v. Dukagjini, 326 F.3d 45, 57 (2d Cir. 2003)). Allowing law enforcement officers to act as experts in cases involving these oft-impenetrable criminal organizations responds to the same concerns that animated the enactment of the criminal laws that such organizations (and their members) are typically charged with violating, such as the RICO Act, and the more recent Violent Crimes in Aid of Racketeering statute. Gang experts are frequently employed by the government in prosecutions of MS-13 members. See, e.g., United States v. Zelaya, 2009 WL 1931191, at *1 (4th Cir. 2009) (noting use of "gang experts" at trial); United States v. Hernandez-Villanueva, 473 F.3d 118, 120 (4th Cir. 2007) (law enforcement expert on MS-13 used at sentencing); United States v. Rivera, 292 F. Supp. 2d 827, 833-34 (E.D. Va. 2003) (noting testimony of gang experts at pre-trial hearings).

Gang experts assist the trier of fact by, for example, explaining the internal workings and language of the gang.

In Mejia, the Second Circuit expressed its concern that the government was, in essence, using the law enforcement expert as a shortcut to putting on lay witness testimony as to those facts. Because the expert in Mejia was simply recounting specific factual events without applying any expertise, the Second Circuit concluded that the expert was doing little more than passing hearsay directly to the jury, which is improper. 545 F.3d at 197-98. The Second Circuit made clear, however, that an expert witness may rely on testimonial statements as a basis for his opinion, so long as the expert is not simply repeating, without analysis, the testimonial statements themselves. Because the record disclosed in Mejia that at least one aspect of the expert's testimony was based on nothing more than the testimonial statement of a person detained in connection with the same investigation giving rise to the trial, the court concluded there was a Sixth Amendment Confrontation Clause violation.

In contrast, Detective Saa's testimony regarding MS-13 comported with accepted use of law enforcement gang experts to educate the jury on the operation, symbols, jargon, and internal structure of criminal organizations. See UnitedStates v. Johnson, 587 F.3d 625, 636 (4th Cir. 2009) (distinguishing Mejia

and noting that two law enforcement officers who testified as experts applied their expertise, derived over many years and from multiple sources to interpret the transcripts of phone conversations). Detective Saa testified regarding the historical origins and formation of MS-13, and the spread of MS-13 throughout the United States and Central America, and into Canada and Europe. Detective Saa described the internal structure of MS-13, the various indicia of gang membership, the rules of MS-13, and the terminology used by MS-13. Detective Saa also testified as to the methods and objectives of MS-13. This testimony assisted the jury in understanding and interpreting the testimony of the various MS-13 members called by the Government. The testimony was also relevant to establishing that MS-13 is in fact an ongoing criminal enterprise of national and international scope. Notably, in contrast to Mejia, and contrary to the Petitioner's assertion, the Government did not rely on Detective Saa's testimony to establish any racketeering acts, that evidence was presented through various lay witnesses.

Moreover, nothing in the record suggests that any opinion expressed by Detective Saa on direct examination was merely repeated hearsay. As contemplated by Federal Rule of Evidence 705, Detective Saa's direct examination focused only on his opinions and did not delve into the underlying facts supporting

those opinions.

The Petitioner was not prejudiced by the gang expert's testimony. MS-13 gang members provided testimony proving that MS-13 is an enterprise engaged in racketeering activity. The Government elicited extensive testimony from MS-13 gang members to prove that MS-13 is an enterprise. MS-13 gang members and at least one law enforcement witness presented testimony of racketeering activity by MS-13, including two murders, an attempted murder, and drug trafficking. MS-13 gang member Osmin Heriberto Alfaro-Fuentes testified that killing a rival gang member elevates an MS-13 member's status in the gang.

Also without merit is the Petitioner's claim that he was prejudiced by the gang expert's testimony because it created the impression that MS-13 was a cohesive enterprise as opposed to a series of separate cliques. As the gang expert testified, MS-13 is a criminal street gang with the goal of becoming the most dominant gang in the world. The gang expert also testified about how leaders from different MS-13 cliques attend general meetings together. Osmin Alfaro-Fuentes also testified that MS-13 gang members from different cliques attend general meetings. Luis Serrano Guttierez testified that he and three fellow MS-13 gang members from three different cliques murdered Shannah Angeles, a suspected rival gang member, in July 2006.

The Petitioner acknowledges that his trial counsel challenged one of the Government's peremptory strikes pursuant to Batson v. Kentucky, 476 U.S. 79 (1986). The Petitioner seeks relief on the grounds that his trial counsel were ineffective because, after the Government provided a race-neutral basis for striking the juror, they failed to "preserve" their Batson challenge and "make a record for appeal." This basis for habeas relief is completely devoid of any merit and should be summarily rejected by this Court.

The facts relating to the Petitioner's Batson challenge are clear from the trial record. During jury selection, the first round of venire persons called to the jury box included two women and one man who appeared to be of Hispanic descent. In addition to having Spanish names, the two women had indicated during voir dire that they were fluent in the Spanish language. The male juror, Juror Number 33, also had a Spanish name but did not indicate that he had any level of proficiency in the Spanish language when questioned by the Court during *voir dire*. In addition, Juror Number 33 did not list any occupation in the Court's standard questionnaire, which was distributed to counsel before jury selection.

In exercising its peremptory challenges, the Government struck Juror Number 33. The Petitioner's trial counsel promptly

made a Batson challenge, claiming that the Government had moved to strike Juror Number 33 on account of his being Hispanic like the Petitioner. In response to the Batson claim, the prosecutor explained that it had exercised one of its peremptory strikes on Juror Number 33 because he had not listed an occupation on the questionnaire and because of the jacket he was wearing. The prosecutor also pointed out that it had not exercised a peremptory strike on another Hispanic juror, namely, one of the female jurors with a Spanish surname. Upon hearing the race-neutral basis proffered by the Government and confirming for defense counsel that the jury questionnaires asked for employment information, the Court stated that it was a reasonable basis to strike him, and excused Juror Number 33 from the jury box. S hortly thereafter, the Petitioner's counsel moved to strike one of the female Hispanic jurors upon learning from the Court that she had forgotten to mention that her husband was in law enforcement. On juror who appeared to be of Hispanic descent remained on the jury.

In his petition, the Petitioner asserts in conclusory fashion that his trial counsel failed to properly preserve his Batson challenge, but utterly fails to specify how his attorneys were deficient in this respect. The reason for such a bare-bones assertion is plain: there was nothing more his trial counsel

could have done to prevail on the Batson challenge or on appeal because that challenge lacked merit.

When a defendant raises a Batson challenge, he bears the burden of proving purposeful discrimination on the part of the prosecution. Batson, 476 U.S. at 93; United States v. McMillon, 14 F.3d 948, 952 (4th Cir. 1994). Such a challenge has three steps. First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if that *prima facie* case is made, the burden shifts to the prosecutor to articulate a race- neutral explanation for striking the juror in question. Third, after the prosecutor's explanation is evaluated, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Hernandez v. New York, 500 U.S. 352, 358-59 (1991). See also Barnette, 211 F.3d at 812.
Once the United States offers facially valid reasons for its strikes, the burden is on the defendant "to show both that these reasons were merely pretextual and that race was the real reason for the strike." McMillon, 14 F.3d at 953 (emphasis in original). Whether a defendant has met this burden will turn largely on the assessment by the court of the credibility of the prosecutor. Hernandez, 500 U.S. at 365; McMillon, 14 F.3d at 953.

At the Petitioner's trial, the prosecutor had a valid, race-neutral basis for striking Juror Number 33 and promptly articulated that reason when defense counsel challenged the strike under Batson. By not identifying any form of employment, Juror Number 33 either was unemployed or had failed to provide complete information on the questionnaire. Under either the scenario, the Government's strike was reasonable and nondiscriminatory. A juror's occupation or lack of employment are legitimate race-neutral reasons for striking a juror. See, e.g., United States v. Banks, 10 F.3d 1044, 1049 (4th Cir. 1993) (unemployment); United States v. Bynum, 3 F.3d 769, 771-72 (4th Cir. 1993) (unemployment); Smulls v. Roper, 535 F.3d 853, 867 (8th Cir. 2008) (occupation). Similarly, failure to properly complete a questionnaire reflects inattention or deliberate refusal to follow instructions, race-neutral traits that warrant the exercise of a peremptory strike.

The Government's decision to strike Juror Number 33 was based on race-neutral grounds was further supported by the fact that the Government did not strike the other two apparent Hispanic jurors called to the jury box when it had peremptory strikes still available. This fact alone negates any inference of racial motivation that may conceivably arise from the fact that the Government struck one Hispanic juror. See Grandison,

34

885 F.2d at 147 ("the fact that the jury included two black jurors is significant . . . especially . . . where, as here, the government could have used a remaining strike against those jurors but three times declined to do so"). The Court properly credited the prosecutor's race-neutral reasons and there was nothing more defense counsel could conceivably have done to establish that race was the real reason for the strike.

In the Petitioner's case, the Court determined that the prosecutor's non-discriminatory basis was credible. There was nothing Petitioner's trial counsel could have done to undercut the prosecutor's credibility.

Nor was there any suggestion by the Court of Appeals for the Fourth Circuit that its rejection of Petitioner's <u>Batson</u> arguments on appeal was based in part on a failure by trial counsel to make a sufficient record. To the contrary, the Fourth Circuit expressly noted that the Court had credited the Government's reasons as legitimate and nondiscriminatory. Therefore, the Fourth Circuit clearly recognized that the Petitioner  had raised a <u>Batson</u> challenge at trial and properly preserved it for appeal. Based on the sufficient record, the Fourth Circuit properly affirmed the Court's denial of the Petitioner's <u>Batson</u> challenge.

Furthermore, the Petitioner cannot satisfy the prejudice

prong of Strickland. The Petitioner has made absolutely no
attempt to demonstrate that the jurors in his case were not
impartial, or that the absence of Juror Number 33 had an adverse
effect on the trial's outcome. In light of the overwhelming
evidence of his guilt, the Petitioner cannot establish that the
outcome of his trial would have been different had his trial
attorneys succeeded on their Batson challenge.

The Petitioner contends that his trial counsel's
performance was deficient in failing to investigate the murder.
Petitioner specifically criticizes his trial counsel's failure to
interview Elvin Hernandez about a statement by Sergio Amador, an
eyewitness to the crime and the Government's principal
cooperating witness.

Trial counsel adequately investigated this case. During
trial preparation the Petitioner did not deny the admissions that
he made on two occasions to law enforcement agents. In fact, the
Petitioner admitted to trial counsel that he had driven Amador
and the other conspirators to the scene of the shooting. In
light of Petitioner's admissions, trial counsel's strategy was to
attack the credibility of the Government's witnesses and to
challenge whether the Government had proven that the Petitioner
had prior knowledge of the plan to murder Reyes. Trial counsel
appropriately did not search for witnesses who would falsely

testify that Petitioner was not present at the shooting.

During cross-examination of Amador, trial counsel questioned Amador about his prior false statement under oath, motive to testify falsely, prior inconsistent statement, and prior convictions. Trial counsel elicited testimony from Amador that he had lied under oath when he stated during his plea colloquy that Lobo-Lopez, not he, had fired the final fatal shots into Reyes' body. Trial counsel also extensively cross-examined Amador on his Plea Agreement and the terms of that agreement. Trial counsel questioned him about his desire to have his sentence reduced from life imprisonment. Trial counsel also questioned Amador about his false statement to law enforcement officers after Reyes' murder, in which Amador stated that he had no knowledge of the murder. Trial counsel impeached Amador with his prior convictions in Texas and Virginia, including his conviction in this Court for the murder of Reyes in aid of racketeering activity. Finally, by questioning Amador about his knowledge of the plan or conspiracy to murder Reyes, trial counsel attempted to establish that the Petitioner did not have prior knowledge of any plan to murder Reyes.

Any decision by trial counsel not to adduce testimony about a statement by Amador to Elvin Hernandez referring to the driver as "another person" was reasonable, and would not have changed

37

the outcome of the trial. The statement is vague and would not have discredited Amador's testimony. Amador was thoroughly cross-examined regarding prior false statements under oath and prior inconsistent statements. The statement identifying the driver as "another person" is at best vague or elusive, but not inconsistent. The Petitioner suffered no prejudice from trial counsel's decision not to question Amador about the statement.

The Petitioner next argues that the district court failed to adequately instruct the jury on the presumption of innocence and his trial counsel failed to object, in deprivation of his rights under the Fifth and Sixth Amendments, respectively. Like all his other grounds for relief, this claim lacks merit.

Immediately after the jury was sworn, this Court gave the jury a few preliminary instructions. The jury was initially instructed that it was their duty to judge the facts from the evidence presented, and then apply those facts to the law provided by the Court. The Court explained that the evidence would consist of the testimony of witnesses, documents, and other items admitted into evidence as exhibits, as well as to any stipulated facts. The Court admonished the jury that certain things, like arguments, objections, or questions of counsel, were not evidence. The Court instructed the jury that they were to decide the case solely on the evidence presented, and to not

research or make any investigation about the case on their own. Finally, the Court instructed the jury not to form any opinion until all the evidence was in, and to keep an open mind until they began their deliberations at the end of the case.

After the parties adduced their evidence and rested, the Court gave its final charge to the jury. The Court again instructed the jury that it was their duty to follow the law and to apply the law to the facts as they determined from the evidence. In addition to instructing the jury on the elements of each offense charged, the Court twice instructed the jury that the Petitioner was presumed innocent. Specifically, the Court stated:

> The law presumes a defendant to be innocent
> of a crime. Thus, a defendant, although
> accused, begins the trial with a clean slate,
> with no evidence against him, and the law
> permits nothing but legal evidence presented
> before the jury to be considered in support
> of any charge against the accused . . . So
> the presumption of innocence alone is
> sufficient to acquit a defendant, unless you
> are satisfied beyond a reasonable doubt of
> the defendant's guilt after a careful and
> impartial consideration of all of the
> evidence in the case.

Thus, in its final charge to the jury, the district court made it absolutely clear that the Petitioner was presumed to be innocent,

and the jury could only find him guilty if the evidence proved his guilt beyond a reasonable doubt.

Unable to cite a single case where the absence of a presumption of innocence instruction during the preliminary instructions resulted in a reversal of a conviction, the Petitioner instead quotes dicta from United States v. Veltmann, 6 F.3d 1483, 1493 (11th Cir. 1993) and William S. Laufner, The Rhetoric of Innocence, 70 Wash. L. Rev. 329 (1995). It is not surprising that there is a paucity of court decisions assigning error, let alone reversing a conviction, on the grounds that the presiding judge neglected to give a presumption of innocence instruction in its preliminary remarks. In determining whether a court erred in instructing the jury, the jury instructions must be reviewed "as a whole," thereby considering the alleged error or omission in the context of the instructions that were given. United States v. Cobb, 905 F.2d 784, 788-89 (4th Cir. 1990). In addition, once an instruction is given, the jury is presumed to have followed it. See, e.g., Yates v. Evatt, 500 U.S. 391, 403 (1991) ("sound presumption of appellate practice [is] that jurors are reasonable and generally follow the instructions they are given"); United States v. Alerre, 430 F.3d 681, 692 (4th Cir. 2005) ("Ordinarily . . . we presume that a properly instructed jury has acted in a manner consistent with the instructions").

40

These principles compel the conclusion that where, as here, the
district court properly instructed the jury on the presumption of
innocence during its final charge, the lack of a preliminary
instruction on the presumption of innocence did not infringe
upon the defendant's due process rights. United States v.
Olivas, 426 F. App'x 344, *347 (5th Cir.2011) (unpublished).

Significantly, the Supreme Court held in Kentucky v.
Wharton, 441 U.S.786, 789 (1979), that the failure to give a
presumption of innocence instruction does not necessarily
violate the Constitution. In Wharton, the trial judge refused to
give a presumption of innocence instruction, but did instruct the
jury that they could return a verdict of guilty only if they
found that the defendant committed the crimes with which he was
charged beyond a reasonable doubt.    In holding that the Kentucky
Supreme Court erred in ruling that the Due Process Clause
absolutely required that an instruction on the presumption of
innocence be given in every criminal case, the Supreme Court
stated:

> [T]he failure to give a requested
> instruction on the presumption of innocence
> does not in and of itself violate the
> Constitution. Under [Taylor v. Kentucky,
> 436U.S. 478 (1978)], such a failure must be
> evaluated in light of the totality of the
> circumstances – including all the
> instructions to the jury, the arguments of
> counsel, whether the weight of the evidence

41

was overwhelming, and other relevant factors
– to determine whether the defendant
received a constitutionally fair trial.

441 U.S. at 789-90. Thus, the lack of a presumption of innocence instruction only implicates the Due Process Clause when, under all the circumstances, the defendant did not receive a fair trial.

Here, when considering the fact that the Court twice instructed the jury on the presumption of innocence in its final charge, it cannot be said that the lack of a presumption of innocence instruction in the Court's preliminary remarks deprived the Petitioner of a fair trial. Therefore, counsel's alleged failure to object to the Court's preliminary instructions neither constituted deficient performance nor prejudiced the Petitioner.

Conceding that trial counsel engaged in plea negotiations, the Petitioner nonetheless asserts that trial counsel's performance was deficient in not obtaining a satisfactory offer. The Government informed trial counsel that Petitioner could plead guilty to aiding and abetting murder in aid of racketeering activity and agree to cooperate by providing information about any known criminal activity, in exchange for the dismissal of the remaining charges in the Indictment and the possibility of the

Government filing a motion to reduce his sentence. Trial counsel properly informed the Petitioner that aiding and abetting murder in aid of racketeering activity would result in a sentence of life imprisonment. Through cooperation, the Petitioner could possibly receive a sentence reduction. As stated in trial counsel's Affidavit, the plea offer was communicated to the Petitioner.

The Petitioner now contends that trial counsel did not obtain a satisfactory plea offer. Trial counsel communicated to Petitioner the only plea offer made by the Government. Like his conspirator Amador, the Petitioner would have to plead guilty to murder in aid of racketeering, receive a sentence of life imprisonment, and agree to cooperate. The Petitioner's decision not to accept the only plea offer communicated to his trial counsel does not render trial counsel's performance deficient.

For the foregoing reasons, the Petition filed in this case pursuant to 28 U.S.C. § 2255 should be dismissed.

An appropriate Order shall issue.

/s/<br>
Claude M. Hilton<br>
United States District Judge

Alexandria, Virginia
February /9 , 2013